IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 23, 2002 Session

## CHRISTMAS LUMBER COMPANY, INC. v.
## ROBERT E. VALIGA, ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 103270-2      John F. Weaver, Chancellor**

**FILED SEPTEMBER 27, 2002**

**No. E2001-02444-COA-R3-CV**

After experiencing significant problems with the construction of a house he was having built, Robert E. Valiga ("Valiga") sued Robert H. Waddell ("Waddell") and John Graves ("Graves") (collectively referred to as "Defendants") seeking damages for the poor construction. Although the construction contract was between Valiga and R.H. Waddell Construction, Inc., no corporate charter had been filed when the contract was signed. The Trial Court concluded Waddell and Graves were partners and entered judgment against them individually for $80,045.79. After judgment was entered, Defendants filed motions seeking to amend their answers to assert a statute of limitations defense. These motions were denied by the Trial Court. Graves and Waddell appeal, challenging the Trial Court's conclusion that they were partners and subject to individual liability, the denial of their motions seeking to amend their answers to assert a statute of limitations defense, and the Trial Court's award of prejudgment interest to Valiga. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Chancery Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Robert S. Holland, Knoxville, Tennessee, for the Appellant John Graves.

Richard L. Burnette, Knoxville, Tennessee, for the Appellant Robert H. Waddell.

John M. Neal, Knoxville, Tennessee, for the Appellee Robert E. Valiga.

# OPINION

## Background

On January 10, 1990, Christmas Lumber Company, Inc., ("Christmas Lumber") filed a complaint against Valiga, Waddell, and others seeking to enforce a materialmen's lien for building materials purchased by Waddell to be used on the house being built for Valiga. The amount of the lien was approximately $7,209.45.

On December 2, 1992, Valiga filed a separate lawsuit against Waddell and Graves. Valiga claimed he entered into a contract on September 12, 1988, with "what was known as" R.H. Waddell Construction, Inc., for the construction of a house. Valiga claimed he started experiencing problems with the quality of the construction almost immediately after construction began. Valiga complained about the problems, and was assured the house would be constructed according to applicable laws and building codes, etc. Valiga, therefore, allowed construction to continue. The quality of construction did not improve, and Waddell terminated the contract on February 14, 1989, well before construction was completed. Valiga then had the construction work inspected and claims numerous structural defects were found. Valiga attached to his complaint a letter dated March 9, 1989, from the Knox County Department of Code and Administration. This letter lists 22 deficiencies found during the inspection of the unfinished house, many of which were serious structural defects. Because of these defects, Valiga was "ordered" to stop construction on the house "until a professional evaluation has been made, submitted to this office for review, and a determination made regarding remedial action to be taken to correct the conditions noted."

Valiga sued Waddell and Graves personally because, according to the complaint, there was no corporation chartered by the State named R.H. Waddell Construction, Inc. when the contract was entered into on September 12, 1988. The corporate charter was issued after Valiga had entered into the construction contract and the charter apparently was revoked on July 20, 1991. Valiga claimed R.H. Waddell Corporation was a "sham" corporation, an alter ego of Defendants, had no assets, and simply served to receive and disburse funds from Valiga. Valiga sought compensatory and punitive damages from Defendants.

The two lawsuits were consolidated. Christmas Lumber filed a motion for summary judgment against Waddell. Christmas Lumber was granted summary judgment against Waddell personally for $17,083, which included the amount of Christmas Lumber's lien, interest, and attorney fees pursuant to the contractually agreed upon rate. This judgment was entered as a final and appealable judgment, but no appeal was taken by Waddell.

Graves obtained an order from the Trial Court directing Valiga to make a more definite statement as to the cause of action asserted against him. In response, on February 2, 1995, Valiga filed a motion to amend the complaint to state with more specificity his cause of action against Graves. Valiga also sought to add Masters Truss Systems, Inc. ("Masters Truss") as a new defendant. Valiga claimed Masters Truss supplied defectively designed and defectively constructed

trusses on the project. The Trial Court entered an order on June 26, 1995, permitting Valiga to file the amended complaint.

On July 22, 1996, Valiga filed a motion for sanctions against Masters Truss, pointing out to the Trial Court that an order had been entered directing Masters Truss to respond to discovery, and no response had been forthcoming by the deadline set forth by the Trial Court. The next document in the record is a response by Christmas Lumber to a motion for summary judgment filed by Valiga. The motion for summary judgment pertained only to the claim by Christmas Lumber against Valiga. Christmas Lumber notified the Trial Court that Waddell had satisfied the judgment rendered against him and attached a copy of a Release filed with the Register of Deeds Office. The claim by Christmas Lumber apparently was resolved at this point.

In April of 1998, Valiga against sought to amend his complaint, this time seeking to add as a defendant Jack Newman, the previous owner of Masters Truss. This motion was granted on December 3, 1999.[1] On May 8, 2000, Graves filed a motion to dismiss, claiming that neither was he a party to the contract between Valiga and R.H. Waddell Construction Company, Inc., nor was Valiga a third party beneficiary of any agreement between Graves and Waddell. Valiga responded, claiming Waddell and Graves were joint venturers and Graves could be held vicariously liable on that basis. Valiga attached a Joint Venture Agreement entered into between Graves and Waddell dated November 11, 1988. The stated intent of the Joint Venture Agreement was "to enter into an agreement for the purpose of the construction of a residence located on a lot owned by Robert E. Valiga . . . ." The Joint Venture Agreement went on to provide:

1.     PURPOSE

That this Agreement is entered into in order to assure continuity regarding this particular project in the event of the death or disability of Robert Waddell and/or John Graves. Further, that a significant purpose is to assure shared liability in the event of a lawsuit or other legal action against either Robert H. Waddell or John Graves.

2.     DURATION

This agreement is effective as of the date of execution and shall remain effective unless cancelled in writing by one or more of the parties or otherwise terminated as provided herein during the course of construction of the above captioned property. Once the construction of the above captioned property is completed according to the plans and specifications and a closing is held and the funds are

---

[1] The claim against Jack Newman was nonsuited on the day of trial. Valiga's claim against Masters Truss was not pursued at trial because Masters Truss, apparently, was no longer in existence.

paid to each party hereto as provided herein then this agreement shall be null and void.

\* \* \* \*

### 15.    PROFITS AND LOSSES

The profits and/or losses as well as expenses are to be divided equally between the parties.

Graves filed his answer to the complaint on September 18, 2000.  The trial in this matter began that same day.  At trial, Waddell testified he is a land surveyor and has a degree in architecture from the University of Tennessee.  In 1988, he decided to "go into the contracting business" and entered into a contract with Valiga.  Valiga's house was the first and only house Waddell's construction company ever built.  When he entered into the contract with Valiga, Waddell signed the contract on behalf of R.H. Waddell Construction, Inc.  When asked if the corporate charter had been recorded at the time the contract was entered into with Valiga, Waddell stated he had "no knowledge of that."  Waddell was unsure who prepared the charter, although he did not do it himself.  Waddell signed this document as the "incorporator" on the stated date of August 19, 1988, although it was not filed with the Secretary of State's office until December 9, 1988, and with the Registrar's Office in Knox County until January 12, 1989.  On September 12, 1988, the same day Waddell entered into the contract with Valiga, Graves opened an account at Christmas Lumber in order to obtain building materials.  Graves opened the account in Waddell's name and where the account information stated "type of customer," Graves marked "individual."  Graves signed the document on behalf of Waddell.

At trial, Waddell identified a letter he received from Valiga dated November 9, 1988, discussing "requests" being made by Valiga addressing the construction of the house.  Valiga terminated Waddell's services the next day by letter dated November 10, 1988.  Apparently sensing potential litigation, Waddell and Graves on November 11, 1988, entered into the Joint Venture Agreement (Agreement").  The only parties to the Agreement were Waddell and Graves.  R.H. Waddell Construction, Inc., was not a party to the Agreement.  Pursuant to the terms of the Agreement, Waddell and Graves divided funds received from Heritage Federal for construction of the Valiga home.  After Waddell "patched things back up" with Valiga, he returned to work on the project from November until February of the next year.  On February 11, 1989, Waddell received a letter from Valiga wherein Valiga expressed his shock regarding the cost of the construction job.  Three days later, Waddell quit as Valiga's contractor.

Waddell testified to interrogatory responses signed by him under oath wherein he stated Graves was a co-partner in a joint venture agreement for the purpose of constructing the house for Valiga.  He also indicated Graves had "arranged the contract with Valiga."  During a pretrial deposition, when asked why he and Graves had entered into the Agreement, Waddell stated "since John and I were in partnership – were in a partnership for this project, you know, we both kind of

felt that we needed some type of an agreement about our status on the job." Waddell later testified it was his intent to operate as a corporation and not as a partnership or an individual. Waddell admitted he and Graves split the $11,500 contractor's fee received from the Valiga project. He and Graves also equally paid Christmas Lumber's judgment against Waddell. Waddell stated that after the corporation was established, no one paid anything to the corporation for stock and no one contributed any capital. He is unaware of any corporate officers or directors being elected.

Ronald Newman was the owner of Master Truss Systems, Inc., which manufactured the trusses used in the Valiga home. At trial, Newman explained how trusses are built and their function. According to Newman, he went to the home to inspect it after he received a telephone call from Valiga. He saw the floor trusses in the great room had been placed upside down. In addition, "there were some hangers that needed to be straightened up, and also some bearings for the girder trusses, which is a truss that carries several other trusses, and concentrated loads on the wall, and it needed bearings from the top plate all the way to the basement, which they didn't have." Newman also stated a truss installed upside down will create a sag in the floor up to a half inch.

Graves testified he does "tax preparation" for a living. Graves acknowledged signing the Joint Venture Agreement which provided he was to receive 50% of the contractor's fee. However, Graves received only $5,570 of the $16,000 contractors fee. Graves testified his company, "Tax Management", actually received these payments. Graves claimed he made no decisions concerning the construction of the Valiga house. Graves stated he was on the job six to eight hours a day for a majority of the time the house was being constructed. Graves never was a shareholder in R. H. Waddell Construction, Inc. Graves agreed to work on the project because it was not a busy time for his tax preparation business.

Lynn Johnson ("Johnson"), an architect with a bachelor of architecture degree from the University of Tennessee, was called as a witness at trial. Johnson testified he performed a "construction analysis" on the house. The "major conclusion" reached by Johnson "was that the center of the residence was not built structurally sound according to what we saw." Johnson testified there were "tremendous structural flaws." Johnson went on the explain in detail the defects that were found and upon what he based his conclusion. Johnson opined there was a "[g]ood possibility of failure" in the structure resulting from the trusses being installed upside down. There were 25 to 30 trusses improperly installed in just one room. In addition to the trusses being installed improperly, Johnson also observed "poor craftsmanship" throughout the house. After analyzing the condition of the house, Johnson told Valiga he had three options:

> First choice was to take a D-9 bulldozer out there and take the whole thing out and start from the foundation and come back up, worse case scenario. The next case scenario was to take all of the wood off, in other words, take it all the way back to the foundation; leave the concrete blocks in place. There were some problems with doing that. There was a – where the load point comes down at the great room, there was some block work that really wasn't done to carry a loading

condition. So we talked about that a bunch, and then we decided that, no, we won't do that. The third and least expensive solution was to take the middle of the building down, because at that time we established, between the three of us, that that was the most structurally weak part of the building. So that was the decision that was made to take the center part of the house, the roof, the second floor, the first floor, take all that wood out and come back in and re-install new trusses.[2]

Valiga testified he works at Oak Ridge National Laboratory and has a masters degree in nuclear engineering. Valiga stated he "demolished" the center section of the house in accordance with Johnson's suggestion. A significant amount of time was spent replacing and rebuilding the floor trusses. The house was not completed at the time of trial. Valiga and his wife rented an apartment or house while work continued on the house. Valiga entered into evidence an exhibit which outlined the expenses he claimed to have incurred as a result of having to demolish and rebuild much of the house. The total of Valiga's claimed expenses was $324,361.41.[3] Valiga was questioned at length regarding the various expenses and damages as well as the defects in the house. Valiga's testimony was in accord with the testimony of his expert witnesses. Valiga admitted some portions of the house were not torn down after Waddell ceased work because, at that time, it was felt these portions had "some" value. Valiga went on to explain that during the course of making repairs, problems were encountered with the portions that were allowed to remain resulting in additional remedial work. Valiga testified as follows with regard to his understanding of the roles of Graves and Waddell during the construction of his house:

> [Graves] knew a number of folks from the Riversound project that was being built at the time. He did a lot of negotiations and hired a lot of the subcontractors. He seemed to be a person that was quite knowledge[able] about the business end of building.…
>
> Mr. Waddell was a surveyor, as was Mr. Wheeler. They both had architect degrees. Mr. Waddell was going to help do some of the design changes to the prints. He was going to – I believe he had a contractor's license. He was going to be a – I guess the official contractor's license on [the] job in that sense.

___

[2] Valiga also called Gordon Thompson as an expert witness. Gordon Thompson's testimony was in accord with the testimony of Johnson.

[3] It took approximately 10 years for Valiga to finish the repairs and re-construct the home to the point where he could occupy it. There was concern expressed by the Trial Court as to the reasonableness of this length of time and attendant damages. Valiga was, however, awarded substantially less by the Trial Court than he claimed in damages and Valiga does not challenge the amount of the award on appeal. Defendants' attack the amount of the award only by way of claiming an offset to the amount awarded by the Trial Court. Therefore, we will not list each claimed item of damage nor discuss whether they were properly attributable to the alleged conduct of Defendants.

Valiga called Ben Brabson ("Brabson") as an expert witness. Brabson is a certified residential real estate appraiser. Utilizing pictures and other information on the house as it existed in February 1989, Brabson appraised the value of the house at that time. Brabson testified the value of house would have been $140,000 had it been properly constructed and completed in February of 1989. As to the value of the unfinished house in February of 1989, Brabson testified:

> In the condition it was in, it was very difficult to – I don't know how it could have had a whole lot of value after reading some of those reports and looking at the pictures.… The condition the house was in, I don't know what kind of value it would have had. Probably little or no value.

When asked if the house as it then existed was marketable, Brabson stated he found it hard to believe anyone would have purchased the house given all that was wrong with it.

Richard Bender ("Bender") was called as an expert witness by Defendants. Bender performed design work and prepared sketches for the Valiga house. Bender's sketches and design work primarily dealt with the roof structure. The design recommended by Bender utilized a combination of trusses, rafters, and structural steel. Apparently, the design developed by Bender was not used by Valiga. According to Bender, if Valiga had utilized Bender's plans, the structural steel would have been sufficient to hold all the loading that was required in this house. Bender testified repairing the problems with the house could have been accomplished by "getting the proper technicians up and doing it and getting folks up there that wanted to do it…." Bender estimated the repairs could have been accomplished by two or three people and the repairs would have taken "at the most a week … and would be a few thousand dollars maximum to repair it."

In its memorandum opinion, the Trial Court observed that while the September 12, 1988, contract purportedly was between R.H. Waddell Construction, Inc., and Valiga, R.H. Construction, Inc., did not file its charter with the Secretary of State until December 9, 1988, and with the Knox County Register of Deeds until January 12, 1989. The construction problems existed before the charter was filed. The Trial Court also noted while the charter was dated August 19, 1988, there was no explanation for the delay in the filing. According to the Trial Court, Waddell and Graves entered into a "Joint Venture Agreement" which "memorializes their partnership status and their partnership obligations." The Trial Court emphasized Waddell testified at his deposition that since he and Mr. Graves were in a "partnership," they felt they needed an agreement concerning their status on the job, and that they divided the contractor fees. The Trial Court then stated:

> The Court finds that the evidence is overwhelming that RH Waddell Construction, Inc., was a general partnership consisting of Mr. Waddell and Mr. Graves. Again though, and for further consideration during this opinion, the Court finds that [it] is noteworthy and should be kept in mind that Mr. Waddell received the sum of $2,000 for services as an architect out of the contractor's fee

that's embodied in the contract between Mr. Valiga and the partnership RH Waddell Construction, Inc.

\* \* \* \*

[As to plaintiff's damages,] the defects or omission were so substantial as to render the construction or performance worthless …

\* \* \* \*

Here the Court finds that fair and reasonable compensation to the plaintiff is measured by all sums paid by the plaintiff under the contract of $80,045.79, together with prejudgment interest at the rate of eight percent from December 2, 1992, being the date that Mr. Valiga commenced his action.

The Trial Court then proceeded to make seven additional findings, which are: (1) Defendants should have rejected the trusses which were delivered; (2) Defendants did not install the trusses according to the layout or in a workmanlike manner; (3) relying on the testimony of Brabson, the construction was so defective it had a zero value on February 14, 1989; (4) after Valiga terminated Defendants' services on November 9, 1988, Valiga permitted them to return. Defendants did not remain on the job and terminated the job themselves, with full knowledge of the problems, "thereby electing not to cure the problems"; (5) Valiga was more credible than Defendants; (6) the witnesses for Valiga, including Mr. Johnson and Mr. Thompson, were more credible than Mr. Bender, Defendants' witness; and (7) the Court "was unimpressed with Mr. Bender's demeanor during his testimony as well as the content of his testimony." After making these additional findings, the Trial Court went on to add:

The Court is unaware of the statute of limitations having been raised, but Mr. Valiga did not even commence his suit against these defendants, Mr. Graves and Mr. Waddell, until more than three years from February 14, 1989. Now, it may be that other matters would have to be taken into consideration such as when discovery was made of defects and things of that nature, but still, the suit was not even commenced against these defendants until a substantial period of time had passed.

On February 2, 2001, the Trial Court entered judgment for Valiga for $80,045.79, plus prejudgment interest from December 2, 1992. All of the parties filed motions to alter or amend the judgment. As pertinent to this appeal, Graves contended his only contact with this situation was to share in the proceeds and he did not participate in the actual building which took place. Graves also contended prejudgment interest was not proper because of the delay between when suit was filed and when the trial took place, which delay Graves attributed to Valiga. Waddell likewise claimed

prejudgment interest was inappropriate for the same reasons. On June 14, 2001, Waddell filed a Motion to Amend Pleadings to Conform to Evidence Adduced at Trial, seeking to amend his answer to raise a statute of limitations defense. Graves filed a similar motion on July 9, 2001.

The Trial Court ruled on all pending post-trial motions at the same time. The Trial Court concluded Valiga received no notice of a statute of limitations defense prior to or during the trial, "and that the issue of the statute of limitations was not tried, either expressly or impliedly." Accordingly, Defendants' motions to amend their pleadings to assert the statute of limitations defense was denied. The Trial Court also denied the parties' motions to alter or amend.

Waddell and Graves appeal. Both Defendants argue: (1) the Trial Court erred in not allowing them to amend their complaint to assert a statute of limitations defense; (2) the Trial Court erred in awarding prejudgment interest; and (3) the Trial Court erred by imposing personal liability. Waddell also argues he and Graves were entitled to an offset for the value of the "portions of the structure that were constructed prior to the termination of the contract that remain a part of the house today."

## Discussion

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first discuss Defendants' argument that the Trial Court erred when it refused to allow them to amend their answers to assert a statute of limitations defense. Rule 15.02 of the Tenn. R. Civ. P. provides, in relevant part, as follows:

> **Rule 15.02. Amendments to Conform to the Evidence. –** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.…

Defendants argue the issue of whether the statute of limitation had run was tried by implied consent. In support of this argument, Defendants point out that relevant dates were introduced at trial which would establish this defense. Whether the statute of limitations issue was tried by implied consent hinges on the issues that were actually litigated, and the failure to amend

or to request an amendment is not dispositive. *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997). This Court in *McLemore* explained:

> Generally speaking, trial by implied consent will be found when the party opposed to the amendment knew or reasonably should have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby. *Id.* As the Tennessee Supreme Court stated in *Zack Cheek Builders, Inc. v. McLeod*[, 597 S.W.2d 888, 890 (Tenn. 1980)]:
>
> > "Implied consent ... is much more difficult to establish (than express consent) and seems to depend on whether the parties recognized that an issue not presented by the pleadings entered the case at trial. A party who knowingly acquiesces in the introduction of evidence relating to issues that are beyond the pleadings is in no position to contest a motion to conform. Thus, consent generally is found when evidence is introduced without objection, or when the party opposing the motion to amend himself produced evidence bearing on the new issue."
>
> *Id.* (quoting 6 Wright & Miller, *Federal Practice and Procedure* § 1493, at 462-63 (1971)). Trial by implied consent is not shown by the presentation of evidence that is relevant to an unestablished issue when that evidence is also relevant to the established issue. *Hiller v. Hailey*, 915 S.W.2d 800, 805 (Tenn. App.1995) (citations omitted).

*McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997).

Defendants had almost eight years from the filing of the complaint until trial to assert a statute of limitations defense. This defense certainly was not expressly raised prior to or at trial, as evidenced by the pleadings and the Trial Court's statement to this effect. This issue was mentioned by Defendants (as opposed to the Trial Court) for the very first time several months after the Trial Court's judgment was entered. We agree with the Trial Court's conclusion that this issue was not tried by implied consent. Simply because relevant dates were introduced at trial does not mean Valiga was aware of or acquiesced in this issue being tried. These dates were relevant to other issues which were tried, such as potential damages, etc. Proof of the dates when events occurred in this case was nothing more than evidence which was relevant to an established issue or issues, and "[t]rial by implied consent is not shown by the presentation of evidence that is relevant to an unestablished issue when that evidence is also relevant to the established issue." *McLemore*, 968 S.W.2d at 803. The Trial Court's determination with respect to the issue of implied consent "must

be upheld unless there has been an abuse of discretion." *Hobbs v. Hobbs*, 987 S.W.2d 844, 847 (Tenn. Ct. App. 1998). We find no such abuse of discretion in the present case.

Defendants next argue the Trial Court erred when it concluded they were partners and subject to individual liability. On this issue, Defendants make separate arguments. Waddell relies on Tenn. Code Ann. § 48-12-104, which provides as follows:

> **48-12-104. Liability for preincorporation transactions. –** All persons purporting to act as or on behalf of a corporation, knowing there was no incorporation under chapters 11-27 of this title, are jointly and severally liable for all liabilities created while so acting except for any liability to any person who knew or reasonably should have known that there was no incorporation.

Waddell argues he signed the necessary paperwork to have his business incorporated and was unaware of the delay in filing the charter with the Secretary of State's office. He claims, therefore, he did not "know" there was no incorporation. Graves argues he had no responsibility on the construction project and there were insufficient facts to conclude he was in a partnership or joint venture with Waddell.

Pursuant to Tenn. Code Ann. § 48-12-103, absent a delayed effective date, the "corporate existence begins when the charter is filed by the secretary of state." The issues of whether Waddell "knew" there was no corporate existence and whether Waddell and Graves intended to create a partnership or joint venture are primarily factual issues. In resolving the factual issues presented for appeal, we must keep in mind the Trial Court heard the conflicting testimony from the witnesses. "Unlike this Court, the trial court observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). The trial court's determinations regarding credibility, as to those witnesses who testified live, are accorded considerable deference by this Court. *Id.*; *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "'[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Waddell apparently signed the charter on August 19, 1988. On September 12, 1988, the contract was signed between Valiga and R.H. Waddell Construction, Inc. Two months later, on November 11, 1988, Waddell and Graves entered into the Joint Venture Agreement. On December 9, 1988, the charter was filed with the Secretary of State's office. Waddell's claim he did not "know" the corporate charter had not been filed with the Secretary of State is belied by the fact he and Graves essentially memorialized their relationship in writing with the Joint Venture Agreement which was signed after Waddell claims he "thought" there was a corporation and before the corporation actually was formed. Waddell's assertion is made further suspect by his deposition testimony that he and Graves were "partners."

In *Messer Griesheim Indus. Inc., v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588 (Tenn. Ct. App. 2001), this Court discussed what constitutes a partnership, stating:

> A partnership is defined in T.C.A. § 61-1-105(a) (Supp.1999) as "an association of two (2) or more persons to carry on as coowners a business for profit.…" A partnership can only be created pursuant to a contract of partnership, though such an agreement may be either express or implied. *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991). To determine whether a partnership exists, courts must ascertain the intention of the parties. *Id.* In the absence of a written agreement, the requisite intention is that which is deducible from the parties' actions. *Wyatt v. Brown*, 39 Tenn. App. 28, 33, 281 S.W.2d 64, 67 (1955). The parties need only intend "to do the things which constitute a partnership." *Bass*, 814 S.W.2d at 41. A partnership results if the parties "place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them." *Id.* It is not necessary that the parties intend to actually form a partnership or even that they know the legal result of their actions is to create a partnership. *Id.* Accordingly, the terminology used by the parties to describe their business relationship is of little import. *Id.*

> The determination of whether a partnership exists must be made "upon consideration of all relevant facts, actions, and conduct of the parties," *id.*, and the burden of proof rests on the party seeking to establish the existence of a partnership. *Mullins v. Evans*, 43 Tenn. App. 330, 338, 308 S.W.2d 494, 498 (1957). "Generally, what will constitute a partnership is a matter of law, but whether a partnership exists under conflicting evidence is one of fact." *Wyatt*, 281 S.W.2d at 68.

> A joint venture is similar, but not identical, to a partnership, and has been described by our Supreme Court as "something like a partnership, for a more limited period of time, and a more limited purpose." *Fain v. O'Connell*, 909 S.W.2d 790, 792 (Tenn. 1995). Joint ventures are governed by the same rules of law as those governing partnerships. *Federated Stores Realty, Inc. v. Huddleston*, 852 S.W.2d 206, 212 (Tenn. 1992).

*Messer Griesheim*, 45 S.W.3d at 605-06.

Based on the roles occupied by Waddell and Graves during the construction of Valiga's house, coupled with: 1) the terms of Joint Venture Agreement; 2) Waddell's deposition testimony he and Graves were "partners"; 3) Graves' testimony that he spent a significant amount

-12-

of time at the work site; and 4) Waddell and Graves dividing the contractor's fee, we conclude the evidence does not preponderate against the Trial Court's findings leading to its conclusion that Waddell and Graves were partners. We affirm the Trial Court's holding that both Defendants are personally liable.

The next issue is Defendant Waddell's claim he and Graves were entitled to an offset for the value of the "portions of the structure that were constructed prior to the termination of the contract that remain a part of the house today." In other words, Defendants challenge the Trial Court's conclusion that the value of the house when Waddell and Graves terminated their services was $0.00. In reaching this conclusion, the Trial Court relied on Brabson's testimony as set forth previously in this opinion. Defendants' challenge on appeal relies exclusively on Valiga's testimony that he allowed a portion of the house to remain because at that time he thought it had "some" value. This argument ignores Valiga's later testimony. Specifically, Valiga went on to explain that after leaving these portions of the house standing because he thought they had some value, further problems were encountered. At trial, Defendants offered no expert testimony as to the value of those portions of the house that were not demolished after Waddell and Graves ceased work. Accordingly, we conclude the evidence does not preponderate against the Trial Court's finding the house was "worthless" at that time.

The final issue on appeal is whether the Trial Court erred in awarding prejudgment interest beginning on December 2, 1992, the day Valiga filed his complaint. Tenn. Code Ann. § 47-14-123 provides prejudgment interest may be awarded as an element of damages "in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%)." An award of prejudgment interest "is within the sound discretion of the trial court and the decision will not be disturbed upon appellate review unless the record reveals a manifest and palpable abuse of discretion." *Otis v. Cambridge Mutual Fire Insurance Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). In *Scholz v. S.B. International, Inc.*, 40 S.W.3d 78 (Tenn. Ct. App. 2000), we noted that the:

> Tennessee Supreme Court has shifted the balance to favor awarding prejudgment interest whenever doing so will more fully compensate plaintiffs for the loss of use of their funds. Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received.

*Id*. at 83 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998)).

The *Scholz* Court pointed out prejudgment interest may not be appropriate when, *inter alia*, the party seeking prejudgment interest has "unreasonably delayed" the lawsuit or been "so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight". *Scholz*, 40 S.W.3d at 83. In the present case, Defendants' main argument is prejudgment interest is not appropriate because of the lengthy delay between the time the complaint was filed and this case went to trial. We agree this case took a long time to get to trial.

Defendants, however, have pointed to nothing in the record to establish any inappropriate conduct on the part of Valiga which needlessly delayed this litigation. Assuming, arguendo, that there were delays which were out of the ordinary, we cannot assume Valiga was responsible for the delays any more than we can assume Defendants were responsible. In light of the foregoing, we cannot conclude the Trial Court's award of prejudgment interest was an abuse of discretion.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed equally against the Appellants Robert H. Waddell and John Graves, and their sureties.

_____
D. MICHAEL SWINEY, JUDGE