# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 17, 2003 Session

## HITCHCOCK METAL SOURCES, INC., ET AL. v. JOHN D. MULFORD, JR., ET AL.

### Appeal from the Chancery Court for Knox County
### No. 136486-3     Sharon J. Bell, Chancellor

### FILED JANUARY 29, 2004

### No. E2003-00738-COA-R3-CV

---

Diane Hitchcock ("Mrs. Hitchcock") and Hitchcock Metal Sources, Inc. ("HMS") sued John D. Mulford, Jr. ("Mulford") and Mulford Enterprises, Inc. ("the defendant corporation") for breach of an oral contract between Mulford and Mrs. Hitchcock's deceased husband, James H. Hitchcock ("Mr. Hitchcock"). Mulford and the defendant corporation responded by filing a counterclaim against Mrs. Hitchcock and HMS, asserting, *inter alia*, breach of contract. At the conclusion of a bench trial, the court found in favor of Mrs. Hitchcock, awarding her damages of $87,896.74 jointly and severally against Mulford and the defendant corporation, and an additional amount of $8,855.93 against the defendant corporation. The trial court dismissed the counterclaim of Mulford and the defendant corporation, as well as the original claim of HMS.[1] Mulford and the defendant corporation appeal the trial court's dual determinations that the parties' oral agreement did not prohibit either party from pursuing other business opportunities and that the defendant corporation converted Mrs. Hitchcock's steel by selling it without her knowledge or consent. In addition, the defendants contend that the trial court erred in failing to reform the parties' contract and in its calculation of damages. By way of a separate issue, Mrs. Hitchcock asserts that the trial court abused its discretion in failing to award her prejudgment interest. We affirm the trial court's judgment *in toto*.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

John A. Lucas, Knoxville, Tennessee, for the appellants, John D. Mulford, Jr., and Mulford Enterprises, Inc.

Charles G. Taylor, III, Knoxville, Tennessee, for the appellees, Hitchcock Metal Sources, Inc., and Diane Hitchcock.

---

[1]HMS did not appeal the dismissal of its claim.

**OPINION**

I.

As of 1987, Mr. Hitchcock and Mulford both had extensive experience in the steel industry. Mulford operated through his business, the defendant corporation, while Mr. Hitchcock worked for a Pennsylvania company that was engaged in the steel business. In late 1987, Mulford, who was interested in expanding his business, learned of Mr. Hitchcock and his involvement in the business of buying and selling steel. Mulford contacted Mr. Hitchcock, and the parties discussed going into the steel business together.

A short time later, the two men entered into an oral agreement to jointly purchase surplus steel, sell the steel, and split the expenses and profits. Under the terms of their agreement, they agreed to share four categories of expenses: the cost of purchasing the steel, the cost of processing the steel, the cost of storing the steel, and the cost of shipping the steel. All other expenses incurred by either party were to be paid by the party incurring the expense. While operating under this oral agreement, each of the parties dealt in steel purchases and sales without sharing with the other. Sometime after entering into the agreement, Mr. Hitchcock formed HMS, after which the corporation was the primary mechanism through which Mr. Hitchcock dealt when engaged in his separate business transactions.

On December 30, 1991, the parties executed identical surviving spouse agreements, which provided that, in the event one party predeceased the other, the surviving party would continue the business and share the profits with the deceased's widow or his estate. Mr. Hitchcock died on April 20, 1995. A few weeks later, Mulford visited Mrs. Hitchcock and asked to review Mr. Hitchcock's books. Mrs. Hitchcock agreed, allowing Mulford to review the books pertaining to both their business venture as well as Mr. Hitchcock's separate business dealings through HMS and otherwise.

For the next six months, Mulford and the defendant corporation continued the joint business of buying and selling steel with Mrs. Hitchcock. Mrs. Hitchcock then approached Mulford and informed him that she was terminating her business relationship with the defendants, as she was losing money on the venture; in the six months that followed the death of Mr. Hitchcock, Mrs. Hitchcock had paid nearly $20,000 more to the defendants than she had received in income. Mrs. Hitchcock informed Mulford that she had a potential buyer for her half of the steel; but Mulford cautioned Mrs. Hitchcock against selling her share of the inventory. Instead, Mulford apparently indicated to Mrs. Hitchcock that the defendants would purchase her share of the steel. Over a period of about eight months, Mulford faxed Mrs. Hitchcock numerous calculations of the value of her share of the steel inventory. The final fax, dated June 10, 1996, calculated Mrs. Hitchcock's share to be worth $87,896.74. Despite Mrs. Hitchcock's expressed desire to sell her share of the inventory, her clearly expressed desire to terminate the parties' venture, and Mulford's indication that the defendants would purchase her share of the inventory, the defendants never paid Mrs. Hitchcock the stated value of $87,896.74 or suggested that she take possession of half of the steel. Instead, the

defendants sold Mrs. Hitchcock's share of the steel as if their venture was ongoing. No portion of the $87,896.74 was paid to Mrs. Hitchcock.

On November 19, 1997, over two years after Mrs. Hitchcock told Mulford she was terminating the business relationship, Mrs. Hitchcock and HMS sued Mulford and the defendant corporation, alleging that the defendants had breached the surviving spouse agreement. Mrs. Hitchcock alleged that assets of the joint business had been "converted to the use of the defendants." The defendants answered and filed a counterclaim against Mrs. Hitchcock and HMS, alleging that Mr. Hitchcock had breached the parties' original oral agreement by self-dealing, *i.e.*, by engaging in private transactions for the purchase and sale of steel without sharing with the defendants pursuant to the parties' agreement. As a result of this alleged breach, the defendants asserted that the counter-defendants were obligated to them for an amount in excess of $300,000, which amount, they alleged, represents their share of profits from Mr. Hitchcock's separate "secret" business transactions.

The case proceeded to trial on October 17 and 18, 2002. At the conclusion of the trial, the court ruled in favor of Mrs. Hitchcock and awarded her $87,896.74 in damages, jointly and severally against Mulford and the defendant corporation. This amount represents the final calculation, as determined by the defendants, of the value of Mrs. Hitchcock's share of the steel inventory. In addition, the trial court ordered the defendant corporation alone to pay Mrs. Hitchcock $8,855.93, representing the amount of "unauthorized" expenses charged to Mrs. Hitchcock by the defendant corporation. Mrs. Hitchcock's request for prejudgment interest was denied.

From this judgment, the defendants filed a notice of appeal.

## II.

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness as to the trial court's factual determinations – one that we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **Wright v. City of Knoxville**, 898 S.W.2d 177, 181 (Tenn. 1995); **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993). Our review of questions of law is *de novo* with no presumption of correctness. **Campbell v. Florida Steel Corp.**, 919 S.W.2d 26, 35 (Tenn. 1996); **Presley v. Bennett**, 860 S.W.2d 857, 859 (Tenn. 1993).

## III.

### A.

The defendants raise several issues on appeal. These issues can be synthesized into the following:

> 1. Does the evidence preponderate against the trial court's finding that the oral agreement between the original contracting parties did

not prohibit either from pursuing business opportunities to the exclusion of the other?

2. Does the evidence preponderate against the trial court's finding that the defendant corporation "converted the steel belonging to Mrs. Hitchcock by selling it without her knowledge and consent"?

3. Does the evidence preponderate against the trial court's findings that the amount due Mrs. Hitchcock for the conversion is $87,896.74?

4. Did the trial court err in failing to reform the parties' contract?

5. Does the evidence preponderate against the trial court's finding that the defendant corporation is liable to Mrs. Hitchcock for charges of $8,855.93 wrongfully assigned to her?

We will address each of these issues in turn.

B.

We begin by discussing the trial court's finding that the oral agreement between Mulford and Mr. Hitchcock did not prohibit either party from pursuing separate business opportunities in the steel business. At the conclusion of the trial below, the court found that the parties "acted more as a joint venture than they did as a partnership." The court then went on to state the following with respect to the terms of the agreement:

> Respectfully, I do not believe that there was a prohibition in the 1987 contract against either party having separate business. . . . [Mulford] believed that there was, but unfortunately never made that condition a mutually-agreed upon part of the contract, or at least I cannot find that it's more likely that not or by a preponderance of the evidence that he did so.

The defendants argue that the business arrangement contemplated by the parties' oral agreement constituted a partnership, rather than a joint venture, and that as "partners," each of the parties owed certain fiduciary duties to the other. One of those fiduciary duties, the defendants assert, is the duty to refrain from engaging in self-dealing. In setting up their argument that Mr. Hitchcock and HMS engaged in prohibited self-dealing, the defendants urge us to consider how the nature of the business dealings of Mr. Hitchcock, on the one hand, and the defendants, on the other, were fundamentally different when they first entered into their joint business relationship. At that time, Mr. Hitchcock had not yet formed HMS and was not then engaged as an individual in the steel business. Rather, he worked for a company in Pennsylvania that was engaged in the steel business. In other words, he was an employee. On the other hand, Mulford, through the defendant corporation,

was already engaged in the business of buying and selling steel and had numerous pre-existing clients. The defendants argue that Mr. Hitchcock had no pre-existing business to protect while the defendants did. They argue strenuously that their pre-existing clients were excluded from the new venture. They contend that since Mr. Hitchcock had no pre-existing business, there was no reason, at that time, to address accounts that did not exist. It is the defendants' position that neither party could self-deal "going forward," but that this prohibition did not apply to the defendants' accounts that pre-existed their arrangement.

The defendants' position is that Mr. Hitchcock breached a fiduciary duty to them by engaging in so-called "secret sales" outside of the dealings of their "partnership." The defendants go on to argue that, even if the court finds that the parties' were joint venturers rather than partners, Mr. Hitchcock still owed the defendants the same fiduciary duty not to self-deal and that he breached the parties' agreement when he did so.

We cannot say that the evidence preponderates against the trial court's finding that the actions of the parties were more in keeping with a joint venture rather than a partnership. *See* ***Christmas Lumber Co. v. Valiga***, 99 S.W.3d 585, 595 (Tenn. Ct. App. 2002) (citing ***Fain v. O'Connell***, 909 S.W.2d 790, 792 (Tenn. 1995)). However, it is immaterial as to what terminology is assigned to the parties' business relationship, be it partnership or joint venture, as the trial court found that Mr. Hitchcock's separate business dealings, as well as the defendants' separate business dealings, *were outside the scope of the parties' oral agreement.* If these dealings were beyond the scope of the agreement, then there can be no breach of fiduciary duty for engaging in them.

Under the original oral agreement, the parties agreed to contact one another when they learned of a lot of steel that might be appropriate for a joint purchase. Over the next eight years, the parties continued to jointly purchase steel for their business venture, while, at the same time, engaging, individually, in separate purchases and sales of steel. The trial court apparently believed that their conduct over these eight years reflected their intent to sometimes act jointly while preserving their right to act individually. The evidence simply does not preponderate against this premise.

The defendants maintain that they were unaware that Mr. Hitchcock had been engaged in these separate business dealings until Mulford examined the books maintained by Mr. Hitchcock following the latter's death. However, it is difficult to understand why Mulford would wait some two and a half years before he and his corporation claimed, in their counterclaim, that such "secret sales" were a breach of the parties' original agreement. We believe his silence "speaks volumes" regarding the right of each party to engage in transactions to the exclusion of the other.

The evidence does not preponderate against the trial court's finding that Mr. Hitchcock did not breach a fiduciary duty owed to the defendants when he engaged in the subject separate transactions.

C.

With respect to the conversion of the steel, the trial court made the following findings:

> Respectfully, I believe that [Mulford] and [the defendant corporation] converted the steel belonging to [Mrs. Hitchcock] by selling it without knowledge and consent and [the defendants] should be liable for the value of the steel.

"A conversion . . . is the appropriation of the thing to the [defendant's] own use and benefit, by the exercise of dominion over it, in defiance of [the] plaintiff's right." ***Barger v. Webb***, 216 Tenn. 275, 278, 391 S.W.2d 664, 665 (1965); *see also **Pero's Steak and Spaghetti House v. Lee***, 90 S.W.3d 614, 623 (Tenn. 2002). The defendants assert that the finding of a conversion was erroneous because, according to them, the steel belonged to the joint business rather than to either individual party. However, the trial court's finding of a conversion is based upon the implicit finding that, at some point, the parties intended to segregate Mrs. Hitchcock's interest in the steel and, as segregated, her interest would be purchased by the defendants. Rather than giving Mrs. Hitchcock her half of the steel, or paying her for the value of the same, the defendants converted it and proceeded to do business as if the joint venture were still a going concern. Mrs. Hitchcock had made it clear to the defendants that she did not want to continue doing business with them. She wanted to get out of the business by selling her share of the steel to a third party. The defendants cautioned against such an approach, suggesting, instead, that they would buy the steel. From that point forward, a continuation of the business venture was diametrically opposed to what Mrs. Hitchcock had indicated she wanted to do and what the defendants had indicated a willingness to do. Once the parties acted in a manner consistent with a termination of their business venture by identifying Mrs. Hitchcock's *interest* in the steel, the defendants' conduct – as if there was a joint venture going forward – was conduct "in defiance of [Mrs. Hitchcock's] right." ***Barger***, 216 Tenn. at 278, 391 S.W.2d at 665. Accordingly, the evidence does not preponderate against the trial court's finding of a conversion.

D.

Having found that the defendants converted Mrs. Hitchcock's steel, the trial court awarded Mrs. Hitchcock damages against the defendants, jointly and severally, in the amount of $87,896.74:

> Unfortunately, there's no good proof of the value at the time. We have [Mulford's] testimony without any authenticating evidence, and as pointed out by counsel for [the] defense, no refutation of the testimony, but we have [Mrs. Hitchcock] without any way to refute the testimony, because [the defendants], without knowledge of [Mrs. Hitchcock] and an opportunity to inspect, sold the steel and it's unavailable now for us to look at and decide what it's [sic] value was at the time of the conversion. The best evidence I have with an

inference arising from the disposition of the property is that it's still worth what [Mulford] said it was in June of 96 . . . .

The defendants argue that this computation of damages is erroneous, as the proper measure of damages for conversion is the property's value at the time of the conversion. *See* ***Lane v. John Deere Co.***, 767 S.W.2d 138, 142 (Tenn. 1989) (citations omitted). Because, so the argument goes, there is no way to know what the true value of the steel was at the time of the conversion, it was improper for the trial court to speculate. *See* ***id.*** Further, the defendants assert that Mrs. Hitchcock could have requested an independent inspection of the steel, but that she chose not to do so.

As the trial court found, the best evidence of the value of the steel came from Mulford himself, when, in June, 1996, in the last of a series of faxes, he stated that Mrs. Hitchcock's share of the steel was worth $87,896.74. This is not a figure that the trial court pulled from thin air; rather, it was calculated by Mulford and sent to Mrs. Hitchcock with the representation that "[t]his should be the final figure." However, before Mrs. Hitchcock had any reason to believe that the defendants intended to sell the steel as if the parties were still in a joint venture and before she had an opportunity to inspect the steel, the defendants sold it. Based upon Mulford's representation as to the value of the steel and the subsequent actions of the defendants in depriving Mrs. Hitchcock of the steel, we cannot say that the evidence preponderates against the trial court's finding that Mrs. Hitchcock is entitled to $87,896.74 jointly and severally from the defendants.

E.

The defendants next contend that the trial court erred in failing to reform the parties' contract to allow for the charging of expenses over and above the four original shared expenses, *i.e.*, purchasing costs, processing costs, storage costs, and shipping costs. Following Mr. Hitchcock's death, the defendant corporation hired Mulford's son to work as a salesman in Mr. Hitchcock's former territory and paid him a salary. In addition, the defendant corporation incurred overhead expenses, such as telephone and office supply expenses, and expenses for travel and entertainment; the defendants point out that these expenses were all one-sided, as Mrs. Hitchcock was not actively participating in the sales end of the business. Therefore, the defendants claim that the salary paid to Mulford's son, as well as the overhead expenses, should have been split between the defendant corporation and Mrs. Hitchcock, and that the parties' agreement should have been reformed accordingly. The defendants' basis for reformation is that the parties, at the time they executed the surviving spouse agreements in December, 1991, were "mistaken as to the terms of the agreement."

We have addressed reformation of a contract as follows:

> In order to reform a written instrument for mistake, there must have been either a mutual mistake, or a mistake of one party influenced by the other's fraud. A "mistake" is an act which would not have been done, or an omission which would not have occurred, but from ignorance, forgetfulness, inadvertence, mental incompetence,

surprise, misplaced confidence, or imposition, and it must be mutual
or fraudulent.

*Williams v. Botts*, 3 S.W.3d 508, 509-10 (Tenn. Ct. App. 1999) (citations omitted).

While the trial court found that continuing to split only the four agreed-upon expenses "probably was unfair" to the defendants, the court went on to point out that rather than "attempting to renegotiate [the agreement with Mrs. Hitchcock], [Mulford] simply attempted to unilaterally amend the agreements." There is simply no evidence of a *mutual* "mistake" in this case. Rather, the defendants realized that *they* had made a mistake in failing to insist that such expenses should be covered under the terms of the surviving spouse agreements. Such a realization does not amount to a mutual mistake. Therefore, the essential element of reformation has not been met, and we find no error in the trial court's decision not to reform the parties' contract.

F.

Finally, the defendants assert that the evidence preponderates against the trial court's finding that the defendant corporation is liable to Mrs. Hitchcock for expenses charged to her in the amount of $8,855.93. This figure represented one-half of the salary paid to Mulford's son, as well as one-half of the fees for office supplies, telephone, travel, and entertainment. In addressing these expenses, the trial court made the following findings:

> The parties to the December '91 agreement were two corporations. There was no provision in that contract for [Mrs. Hitchcock] to share in expenses other than the four categories enumerated. . . . If I recall, they were the cost of steel and processing and storage and . . . shipping. So that I believe [the] defendant corporation breached the contract by charging the excess expenses.

Mulford admitted at trial that, under the terms of the original oral agreement, the parties shared only the expenses related to purchasing, processing, storing, and shipping the steel. There was nothing in the surviving spouse agreements to indicate that those shared expenses were expanded in any way. Therefore, the evidence does not preponderate against the trial court's finding that the defendant corporation was liable to Mrs. Hitchcock for the full amount of the unauthorized expenses charged to her.

IV.

Mrs. Hitchcock argues that the trial court abused its discretion in failing to award her prejudgment interest. We disagree.

The decision of whether to award prejudgment interest is within the sound discretion of the trial court and will not be disturbed by an appellate court absent a "manifest and palpable abuse of

discretion." ***Myint v. Allstate Ins. Co.***, 970 S.W.2d 920, 927 (Tenn. 1998). "A trial court acts within its discretion when it applies the correct legal standard and reaches a decision that is not clearly unreasonable." ***Bogan v. Bogan***, 60 S.W.3d 721, 733 (Tenn. 2001).

The trial court found that prejudgment interest was not appropriate in this case. It faulted Mrs. Hitchcock for failing to insist upon her share of the steel or in pressing the defendants for a payment representing the value of her share once the defendants gave her what they characterized as "the final figure." The trial court pointed out that, instead of acting in an affirmative fashion, she did nothing, and the defendants proceeded to sell the steel. The trial court apparently thought that the litigation could have been avoided had Mrs. Hitchcock followed through, in an aggressive fashion, with her clearly stated desire not to continue the joint venture. Because Mrs. Hitchcock failed to act, the trial court did not believe it was appropriate to award her prejudgment interest, which is nothing more than the value of the loss of use of money. Finding Mrs. Hitchcock somewhat culpable in this loss, the trial court, in exercising its discretion, declined her request for an additional money award. We cannot say this decision was "clearly unreasonable." *See **Bogan***, 60 S.W.3d at 733. We find no abuse of discretion in the trial court's denial of Mrs. Hitchcock's request for prejudgment interest.

V.

The judgment of the chancery court is affirmed. This case is remanded to the trial court for enforcement of that court's judgment and for the collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellants, John D. Mulford, Jr. and Mulford Enterprises, Inc.

_____
CHARLES D. SUSANO, JR., JUDGE