Allene COATES, Executrix of the Estate of John G. Graves, Plaintiff-Appellant,

v.

Bobby Leon THOMPSON (Graves), Defendant-Appellee.

Court of Appeals of Tennessee, Middle Section.

Aug. 25, 1983.

Permission to Appeal Denied by Supreme Court Feb. 23, 1984.

Dennis W. Powers, Arthur E. McClellan, McClellan & Powers, P.C., Gallatin, for plaintiff-appellant.

Nathan Harsh, Andy Branham, Kelley, Harsh & Kelly, Gallatin, for defendant-appellee.

## OPINION

CONNER, Judge.

This is a will contest.

Defendant-appellee, Bobby Leon Thompson (Graves),[1] the illegitimate son of the decedent, John G. Graves, seeks to have a document purporting to be his father's will declared invalid on the ground of forgery. Should he succeed Mr. Thompson would, as the only child of a deceased father who never married, inherit decedent's entire estate under the statute of descent and distribution. However, if the will is declared genuine, the proponents of the will would take the estate, consisting solely of 125 acres of realty, as legatees thereunder. The lower court entered judgment on a jury verdict finding that the purported will was, in fact, a forgery. Plaintiff appeals contending the trial court's exclusion, as improper rebuttal and hearsay, of certain evidence regarding why suspicious markings may have appeared on the document coupled with a jury instruction which placed on the executrix the burden of explaining any suspicious markings on the will constituted reversible error.

The testator, John G. Graves, died on October 5, 1972. Nearly eight years later, on July 17, 1980, Allene Coates, Mr. Graves' niece and substitute executrix of

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

his estate, offered for probate in the County Court for Sumner County a document alleged to be Mr. Graves' will. The one page handwritten instrument was dated March 2, 1953, and was subscribed "John G. Graves." It was purportedly witnessed by William Rippy and America Rippy. Lattie Graves, the decedent's brother, was named as executor but was unable to so serve by reason of his death on October 7, 1975. Lattie Graves' daughter, Mrs. Allene Coates, was substituted as executrix.

Mrs. Coates' petition for admission of the will to probate stated that:

> ... the reason for the late probate of this Will is that it ... has just been discovered in some old papers in an old trunk.

After a hearing, the probate court ordered the document admitted to probate as the last will and testament of John G. Graves.

The next day, on July 18, 1980, Bobby Leon Thompson, defendant herein, filed a suit in chancery court alleging that he was the illegitimate son of John G. Graves. The chancellor held that Mr. Thompson had by clear and convincing proof established himself to be the illegitimate son of John G. Graves for purposes of intestate succession. Thereafter, this court affirmed, 627 S.W.2d 376, and our supreme court denied an application for permission to appeal. Of course, that judicial declaration of paternity gave defendant standing to bring the instant action.

On April 3, 1981, Mr. Thompson instituted the present suit by filing a petition contesting the purported will in the county court. On March 19, 1982, the issue of *devisavit vel non* was certified to the circuit court. After a jury trial, that court entered judgment on the verdict specifically decreeing that:

> ... the purported Will of the late John G. Graves is a forgery, and, is therefore, null and void and of no force and effect.

Plaintiff's motion for a new trial was overruled and she now appeals.

Specifically, the executrix here contends that the trial court committed reversible error (1) in refusing to admit into evidence rebuttal testimony of Willie Graves together with documentary exhibits thereto tending to explain the presence of foreign markings on the will, and (2) in charging the jury that the burden of proof shifted to the proponent where the physical condition of the purported will itself excites suspicion of forgery. In order to determine whether the trial court erred and, if so, whether that error was harmless or reversible, we must review the proof.

Plaintiff's first witness was America Rippy Borders, a long-time neighbor and friend of John Graves. She testified that her husband, William Rippy, died in 1969; that she and her husband witnessed decedent's will at his request; that she recognized the document propounded as Mr. Graves' will as the one she had signed; that she was familiar with her husband's signature and the signature of the testator; and that in her opinion all signatures on the will were genuine.

Plaintiff's next witness, Thena Graves, niece of the testator by marriage, testified that she drafted the will in question at the request of John Graves in the early 1950's; that John Graves at that time lived with his brother, Lattie Graves; that the testator explained his wishes to her and controlled the wording of the will; that after she finished drafting the will, Mr. Graves told her he was going to have America and William Rippy witness the will for him; and that she recognized the propounded will as the one she had drafted for decedent.

Next, Willie Lee Graves, a minister who now lives in Bowling Green, Kentucky, testified that he is the son of Lattie Graves and a nephew of the testator; that he found the disputed will in an old green metal trunk that his mother used to store important papers; that there were other old documents in the trunk, e.g., deeds, tax receipts, birth certificates; and that he had seen the will prior to decedent's death. Regarding identification of the will Willie Graves testified:

Q. Did you ever talk to John Graves about a Will prior to his death?

A. Yes, sir.

Q. Did he tell you that he had one?

A. Yes, sir.

Q. Did you at any time prior to his death see that Will?

A. Yes, sir.

Q. Would you describe the circumstances under which you saw that Will?

A. Well, I went back up to my father's home and my mother. I wanted to see the Will. My mother went and got it out of the trunk and we stood in the hall at the house there. I looked at the Will and read it.

Q. In time frame, in relation to John Graves' death, can you recall when it was? Was it prior to his death?

. . . . .

A. Yes, it was before his death.

Q. Do you recall how long prior to his death?

A. I would say it was probably fifteen years before his death.

. . . . .

Q. Now, I'll ask you to look at this. Can you identify that?

A. Yes, sir.

Q. What is that?

A. That's the Will that I read when my mother showed it to me.

Defendant's evidence consisted solely of the testimony of his expert, Linton Godown.[2] Mr. Godown, who referred to himself as an "examiner of questioned documents," or what is commonly known as a handwriting expert, was duly qualified as an expert witness. He testified that the signature of John G. Graves on the purported will was a forgery; that said forgery was accomplished by a "tracing method" whereby a "pattern" of the signature to be reproduced was created on the bogus document which was then traced. According to Mr. Godown the pattern used to forge Mr. Graves' signature was one of

indentation whereby a genuine signature on one document was traced while placed over a bogus document using heavy pressure on a soft background. Mr. Godown was much impressed by the fact that the writing of the name did not follow the indentations.

. . . . .

The embossing . . . in connection with this signature . . . means there's something wrong. There's no logical explanation for indented paper like that in the areas of the signatures of the testator and the witnesses. .

. . . Notice that these indentations are far broader than the pen line.

. . . My judgment is that the writing of this is free-hand and the indentations were used for a pattern to locate the signature, and that, in doing the freehand imitation of John G. Graves, the indentations were not followed closely . . . .

. . . . .

In other words, following a model and getting away from it and returning to it, is a suspicious circumstance that is associated with imitative forgery done by one of the tracing methods. . . .

Regarding the signatures of the two witnesses Mr. Godown stated:

Q. (By Mr. Harsh) As a result of your examination, Mr. Godown, were you able to reach an opinion as to whether or not they're the genuine signatures of those two individuals?

A. At the time of my examination, I didn't have any comparison material. Based on the presence of the indication by indentation, a model having been laid down, which was followed, gotten away from and returned to, it is my opinion that the witnesses' signature, the two Rippys, both in the line where they state their name and the line where they signed as witnesses, are imitations of their signature written down by tracing methods.

2. With the permission of the trial court the normal order of proof was altered so as to allow

Mr. Godown, defendant's expert, to testify before plaintiff's expert, Mr. Barber.

Finally, Mr. Godown stated that in his opinion certain dark markings present on, under, by or near the signatures on the will were probably pencil lead but were not made by normal pencil writing. Instead, according to him the carbon resulted from a simple tracing method whereby a coating of pencil lead is spread on the back of a piece of paper to act as a transfer median. Such paper acts somewhat like "carbon" paper in that it transfers a faint carbon image, along with indentation, as a model to follow freehand. He firmly rejected the suggestion that someone might have traced over the signatures in pencil after they were written in ink.

Plaintiff's expert witness was James J. Barber, a professional "document examiner" from Louisville, Kentucky. After being duly qualified as an expert on the subject of forgeries, he testified:

Q. (By Mr. Powers) Mr. Barber, after examining this document, the purported Last Will and Testament of John Graves, and after examining some eleven other handwriting exemplars of John Graves and of the Rippys, do you have an opinion whether or not those signatures that appear on that purported Last Will and Testament are genuine signatures?

A. Yes, sir, I do. I have a conclusive opinion that they are genuine signatures.

Q. What is it that you base that opinion on?

A. Well, from the examination of the handwriting and actually the side by side comparison of the questioned document with the known exemplars and the relationship of the known exemplars to the questioned document. They are all written within a natural variation. No one ever writes their name or a letter the same way twice, but within a natural variation. This is what I based my opinion on, that these are written within a natural variation of each other. You have the same peculiarities and individualities within the questioned document as you do within the known exemplars, the known signatures.

Regarding alleged pencil markings on the will Mr. Barber stated:

Q. Now, did you notice on that Will any pencil?

A. Yes, sir, I did.

.    .    .    .    .

Q. (By Mr. Powers) Do you have an opinion, Mr. Barber, whether or not the pencil is drawn on that Will after the ink or before the ink went down?

A. I would have an opinion that the pencil was drawn on the Will after the ink had been placed there and dried.

On the same subject during cross-examination Mr. Barber testified:

Q. Did you find any pencil anywhere in this Will?

A. Yes, sir. As I stated, it was in the signature of Rippy, William Rippy on the left. In the William, the "a" and "m", and in the signature of William Rippy at the very bottom.

.    .    .    .    .

Q. That's the only place in this whole document that there's any pencil?

A. The "a" and "m" and up at the top. The William Rippy signature up at the very top and left hand corner.

Q. And it's your sworn testimony that you didn't find any pencil anywhere in the signature of John G. Graves?

A. I didn't find any pencil in the signature of John Graves.

Q. None whatsoever?

A. No, sir.

Plaintiff's rebuttal evidence consisted of additional testimony from America Rippy and Allene Coates, which was repetitive in the main, and supplemental testimony from Willie Graves. The alleged evidentiary error in this case centers around the following portion of rebuttal testimony offered by Willie Graves:

Q. (By Mr. McClellan) Mr. Graves, I'm going to hand you three documents and ask you if you will examine those three documents.

A. (Witness reviewing documents) All right.

Q. Where did you find those three documents?

A. I found those in the same trunk.

Q. Same trunk as where you found the Will?

A. The Will came out of, yes, sir.

.    .    .    .    .

THE COURT: I assume you're going to ask him if those are John Graves' signatures on those instruments?

MR. McCLELLAN: No, sir.

THE COURT: Ladies and Gentlemen, you all step into the Jury Room a minute.

(Jury is excused from Courtroom)

MR. McCLELLAN: If the Court, please, these would be basically the questions that I would put to Mr. Graves if the Jury were present.

THE COURT: First, I don't know what documents you've got.

MR. McCLELLAN: I'll pass them to you as he identifies them.

Q. (By Mr. McClellan) During the testimony of Mr. Linton Godown yesterday, Mr. Graves, you were present in the Courtroom, were you not?

A. Yes, sir.

Q. Did you hear him testify as to certain pencil markings on the Last Will and Testament of John G. Graves, which has been made Exhibit 1?

A. Yes, sir.

Q. Do you know how those pencil markings got on that Will?

A. Yes, sir.

Q. All right. Now, I know this is unpleasant for you and your family, but state to the Court, if you will, the mental condition of your mother.

A. Well, she was in Central State six different times. At times, she would lose her mind completely and she would take a lot of shock treatment while she was in Central State. She would lose her mind at times. She wouldn't know anybody. Didn't know any children, either.

Q. Prior to your mother going and being put into the nursing home this last time, did your mother have custody and complete control of Exhibit 1, Exhibit 9, Exhibit 10 and Exhibit 11?

A. Yes.

Q. They were in her possession?

A. In her trunk.

Q. Now, during the periods of time when she was not mentally right, would you describe to the Court and to the Jury what she would do to these documents?

A. Well, she—at times, she had a little pencil about four or five inches long she carried in her apron lots of times and she would write. She wouldn't talk. At times she would just write. She had a habit of sticking it to her tongue and write on the Bible, paper, anything.

Q. I want to hand you what's been marked for the purposes of our proof Exhibit 9, which appears to be a Bill for Divorce and ask you if on the last page all the signatures on that last page have pencil markings tracing the ink markings on them?

A. Yes, they do.

MR. McCLELLAN: Pass that to the Judge.

A. She'd write on the Almanac and sometimes she would erase.

Q. (By Mr. McClellan) Now, Mr. Graves, I want to hand you what's been marked Exhibit 10, which appears to be a Certificate of Birth for Larry Graves and ask you where you found that?

A. I found that in my mother's trunk.

Q. Does that have the same pencil marking over the signature?

A. Yes, it does.

Q. Did your mother do that?

A. Yes, she did.

Q. Mr. Graves, I want to show you Exhibit 11, which purports to be a Tennessee Certificate of Public School Attendance for Hoy Graves and ask you if you found that document in your mother's trunk?

A. I did.

Q. Did your mother, likewise, write over the written names there in pencil?

A. She did. No one else in the household done this.

Q. Now, on occasions, have you seen your mother also erasing the pencil markings that she's placed on documents?

A. Yes, sir.

MR. McCLELLAN: If the Court, please, that's the rebuttal proof that I would put on to the Jury.

THE COURT: I don't think it's admissible. I don't think it's admissible because, one, I don't think it is rebuttal, but just as importantly, I think it violates the Hearsay Rule. For those reasons, I rule that this testimony, introduction of these documents to the Jury is not admissible.

MR. McCLELLAN: Note our exception.

.    .    .    .    .

MR. McCLELLAN: ... Are you saying that I cannot have Mr. Graves give an explanation on why there was pencil markings on this Will?

THE COURT: Right.

That concluded the proof whereupon closing arguments were made and the jury was charged. The following instruction was included:

Where the Will is contested on the ground of forgery and the physical condition of the paper offered for probate is such as to excite suspicion, the party offering the Will must carry the burden of removing the suspicion or forgery or alteration.

Plaintiff contends that this instruction taken in conjunction with the allegedly erroneous exclusion of rebuttal evidence offered to explain the suspicious aspects of the will constitute prejudicial error. We agree.

Our initial inquiry is whether the exclusion of certain testimony offered as rebuttal by Willie Graves was error. The substance of that testimony as quoted above was that Mrs. Gladys Graves, decedent's sister-in-law and custodian of the will during her lifetime, was a compulsive doodler; that she carried around a pencil to complement her habit; and that three documents alleged to be found in the same place as the purported will were also marked on by Mrs. Graves in the same fashion as the signatures on the purported will, i.e., pencil tracings over dried ink. A logical inference that may be drawn from this testimony, if believed, is that Mrs. Graves also traced with pencil over one or more of the signatures on the will, thus explaining its otherwise suspicious appearance. In our view it was error to exclude this testimony as either hearsay or improper rebuttal.

In the first instance, the excluded testimony was not hearsay.

... *Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.* (Emphasis in original.)

*McCormick on Evidence* § 246 p. 584 (E. Cleary 2nd ed. 1972); D. Paine, *Tennessee Law of Evidence* § 47 p. 47 (1974); Fed.R. Evid. 801(c), 802.

■ As regards the oral testimony of Mr. Graves it in no way referred to any out of court statement. Rather, that testimony dealt exclusively with the personal observations and actions of the witness. There was simply no "testimony in court ... of a statement made out of court." Absent reference to any out of court statement (as opposed to personal observation of an occurrence or series of occurrences) the testimony is not hearsay.

■ Although the excluded documents contained out of court statements, they were not offered to prove the truth of the matters asserted therein and thus are also not hearsay. *McCormick on Evidence* §§ 246, 249 p. 584–86, 588 (E. Cleary 2nd ed. 1972).

■ In addition, we believe the testimony was proper rebuttal. The proponent of the will in his case in chief offered proof tending to show that the will was genuine and validly excluded. The opponent of the will in his evidence in defense produced

expert testimony that the will was a forgery and raised questions regarding alleged pencil markings at or near the signatures thereon. In fact, defendant's forgery theory was based in part upon the use of pencil lead as a transfer median which was later "traced over" in ink. It is in this context that plaintiff offered the excluded testimony of Willie Graves in hopes of explaining away the suspicions raised by defendant. Granted that there is considerable discretion in the trial judge regarding whether or not to admit rebuttal evidence. *See Johns v. Caldwell*, 601 S.W.2d 37 (Tenn.App.1980). However, under these circumstances we believe that such discretion was abused. Granted also that plaintiff could have offered this evidence in his case in chief. That fact alone, however, does not render otherwise proper rebuttal inadmissible. Initially plaintiff had the burden of offering proof from which the jury could find the will valid. This she did. At that point plaintiff was under no obligation to explain away "suspicions" not yet raised. However, once the pencil markings were brought squarely into issue by defendant's expert, Mr. Godown, it was not only permissible but probably necessary.

 Mr. Thompson argues that Mrs. Gladys Graves was alive and available to testify for plaintiff in rebuttal and that she should have been called rather than her son, Willie Graves (apparently, a "best evidence" concept). We cannot accept this argument. Mrs. Graves may or may not have proved to be competent as the record reflects she is confined to a nursing home and has a history of mental illness. In any event, just because Mrs. Graves *might* be available to testify does not make what her son observed any less competent or admissible. Plaintiff could have selected to call her as a witness, but was not compelled to do so. She elected to do otherwise, choosing to call Mr. Graves instead. This was her right. Had his testimony been admitted, not only would he have been subject to

cross-examination regarding its veracity, but also defendant could have himself called Mrs. Graves (assuming her competency) to testify regarding the same subject matters, of course, subject to plaintiff's same right of cross-examination.

 Given that the exclusion of Willie Graves' rebuttal testimony was error we now reach the question of whether that error was harmless or prejudicial. Standing alone that error *might* have been harmless. However, when coupled with the court's charge requiring the proponent to offer proof "removing the suspicion" of forgery we cannot conclude that the error was harmless. The jury was told that plaintiff had the duty to explain the markings and, as far as they knew, no explanation was given. On that basis alone the jury could have completely disregarded plaintiff's entire case in chief. Under these circumstances we believe that the error more probably than not affected the judgment. T.R.A.P. 36(b).

 In the last analysis, the trial court's instruction [3] coupled with its refusal to admit the rebuttal evidence of Willie Graves as to Gladys Graves propensity for doodling put the proponent of the will in the untenable posture of having to explain the suspicious markings thereon, but then not being allowed to do so.

Accordingly, the judgment of the trial court is reversed and this cause is remanded for a new trial consistent with this opinion. The costs are taxed one-half to the plaintiff and one-half to the defendant.

REVERSED AND REMANDED.

LEWIS and CANTRELL, JJ., concur.

---

**3.** We believe the jury instruction in question is a correct statement of Tennessee law. *See* W. Smith, *Tennessee Jury Instructions—Civil Cases*, § 46–4 p. 466 (1963); *Haynes v. Mullins*, 30 Tenn.App. 615, 618, 209 S.W.2d 278, 279 (1947); 1 Pritchard, *Wills and Administration of Estates* § 369 p. 473 (4th ed. 1983).