# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 7, 2017 Session

## ALICIA LEI ALUMBAUGH v. WACKENHUT CORPORATION

**Appeal from the Circuit Court for Davidson County**
**No. 13-C2198     Thomas W. Brothers, Judge**

_____

### No. M2016-01530-COA-R3-CV

_____

After the plaintiff's father was killed by an armed security guard, she filed a wrongful death action against the security guard's employer. The complaint alleged both vicarious and direct liability and sought an award of compensatory and punitive damages. The employer maintained that the guard acted in self-defense. After the first trial, the jury rendered a verdict in favor of the plaintiff. But the trial court ordered a new trial based on errors in the calculation of damages. A second jury verdict apportioned the greater proportion of fault to the decedent, resulting in a defense judgment. On appeal, the plaintiff contends that the trial court made numerous errors in the conduct of the second trial. After a thorough review, we conclude that the trial court did not commit reversible error. So we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY J. BENNETT and RICHARD H. DINKINS, JJ., joined.

Michael W. Gaines and Barry A. Cohen, Tampa, Florida, and Michael H. Rowan, Nashville, Tennessee, for the appellant, Alicia Lei Alumbaugh.

Karl M. Braun, Jennifer M. Eberle, Carson W. King, and Robert E. Boston, Nashville, Tennessee, for the appellee, Wackenhut Corporation.

# OPINION

## I.

### A.

In the early morning hours of June 24, 2007, Robert Mangrum, a security guard employed by Wackenhut Corporation, shot and killed Tim Alumbaugh. The shooting took place at a Pilot Travel Center on West Trinity Lane in Nashville, Tennessee. Wackenhut assigned Mr. Mangrum to the West Trinity Lane Pilot approximately eight to nine months before the shooting.

On May 28, 2013, Mr. Alumbaugh's minor child, Alicia Alumbaugh, filed this action in the Circuit Court for Davidson County, Tennessee, against Wackenhut Corporation[1] and Pilot Travel Centers, LLC, which had contracted with Wackenhut to provide security. But ultimately Ms. Alumbaugh reached a settlement with Pilot.

The complaint alleged both vicarious liability for Mr. Mangrum's actions and direct liability for negligent hiring, retention, training, and supervision. Ms. Alumbaugh requested a jury trial and an award of both compensatory and punitive damages. In response, Wackenhut admitted that Mr. Mangrum was acting in the course and scope of his employment but alleged that the shooting was in self-defense.

The first trial against Wackenhut resulted in a jury verdict finding the decedent 49% at fault and Wackenhut 51%. The court then granted the plaintiff's request for a new trial based on errors in the jury's calculation of damages.

### B.

1. Plaintiff's Proof

At the second trial, the plaintiff offered two witnesses on the issue of liability: an eyewitness, Lori McDunn, and Wackenhut's corporate representative, Andy Bedlack. The plaintiff also relied on excerpts from Wackenhut's security guard training materials and the incident reports related to the West Trinity Lane Pilot produced during discovery.

The jury viewed the videotaped testimony of Ms. McDunn. Although now a recovering alcoholic, Ms. McDunn acknowledged that, while she was dating Mr. Alumbaugh, their lives revolved around alcohol. They had both been drinking

---

[1] In 2010, Wackenhut Corporation changed its name to G4S Secure Solutions (USA) Inc. Like the trial court, we use the name of the entity as of the date of the shooting.

2

extensively before they stopped at Pilot. After they both finished work on Saturday, June 23, they split a six-pack of beers and then headed to Nashville. Along the way, they stopped for more alcohol. Once in Nashville, they visited a downtown bar where they continued to drink until the bar closed, early the next day.

The altercation that resulted in Mr. Alumbaugh's death lasted only a few minutes. Ms. McDunn explained that events transpired quickly, and her recollection was hazy at times. After the fact, she gave two statements to the police—one immediately after the shooting and one several hours later. Although her statements differed in some details, she consistently maintained that Mr. Alumbaugh was the aggressor.

Mr. Alumbaugh and Ms. McDunn arrived at the Pilot after two in the morning. At this point, Ms. McDunn explained that she was exhausted and was only interested in going home to Clarksville to get some sleep. Mr. Alumbaugh parked in the back lot between two tractor-trailers. Ms. McDunn initially thought they stopped to buy cigars, but Mr. Alumbaugh had more amorous intentions. He was standing at the opened passenger-side door, and she was seated in the passenger's seat when she heard a man's voice asking what they were doing. Mr. Alumbaugh told Ms. McDunn, "don't worry; I've got this" and shut the door. From inside the car, all she could hear at this point were raised voices and shuffling sounds.

When she emerged from the car, she discovered Mr. Alumbaugh fighting with a security guard. Mr. Alumbaugh appeared angry and aggressive. The guard seemed confused and fearful. The guard asked her if she was okay. He also tried to enlist her aid in calming Mr. Alumbaugh. But Mr. Alumbaugh told her to get in the driver's seat of the car and drive because they were leaving. She was too scared to comply.

Ms. McDunn pleaded with Mr. Alumbaugh to cooperate. He had a handcuff dangling from his wrist. She thought the guard tried to call someone. And at one point, the guard unholstered and then holstered his gun. While the guard was talking, Mr. Alumbaugh shoved the guard violently against a nearby tractor-trailer. She distinctly heard the impact of the guard's head against the vehicle. She feared for the guard's life. Mr. Alumbaugh then overpowered the guard. He was on top of the guard when she heard a gunshot, and Mr. Alumbaugh slumped forward. She turned Mr. Alumbaugh over and saw that he had been shot in the chest.

Ms. McDunn recalled yelling at the guard, "Why did you have to shoot him in the chest?" But as soon as the words came out of her mouth, she "knew that [Mr. Alumbaugh] was on top of him, and it was one – it was going to be one life or another at that point."

The guard's employer, Wackenhut, at the time of trial, was the largest provider of security services in the world. Mr. Bedlack explained that Wackenhut exercised great

care in selecting and training security guards.  Applicants were required to have previous experience in law enforcement or the military.  And the company conducted in-depth interviews, background checks, and psychological and personality testing for each applicant.  The screening process was designed, among other things, to identify and avoid hiring applicants unsuited to private security.

All Wackennhut security guards completed a minimum of forty hours of training, well above state requirements.  The training covered a wide variety of topics designed to prepare the guards for what to expect in the field.  Wackenhut "train[ed] them . . . to assess, to observe, to investigate, to identify when things are going wrong unless there's obviously something that just happens in front of them."  But, as Mr. Bedlack observed, "you just can't plan for everything, obviously, so there's not a playbook out there that has every possible scenario."

Wackenhut trained its guards to appreciate the difference between private security and law enforcement.  A security guard's "primary responsibility [wa]s to observe and report."  Wackenhut discouraged its personnel from making arrests unless absolutely necessary because they only had the authority to make citizen's arrests.  Wackenhut's stated policy was that "its personnel will not make arrests except in the most unusual of circumstances."  But even in unusual circumstances, law enforcement should be called "if possible."

After completing the training program, Wackenhut expected its security personnel to use their best judgment in the field.  At trial, the plaintiff's counsel highlighted the potential danger associated with behaving like a "law enforcement wanna-be" or a "hotdog" security guard.[2]  Mr. Bedlack agreed that a security guard who exhibited these behaviors could potentially overreact, endangering both the guard and others.  Consequently, Wackenhut strove to avoid hiring applicants who exhibited these behaviors and included a description of these behaviors in its training materials.

In 2007, as the general manager for Middle Tennessee, Mr. Bedlack was ultimately responsible for the provision of security services in his territory.  His subordinates visited each Pilot location in Middle Tennessee once or twice per week.  And Mr. Bedlack frequently discussed security guard performance with Pilot representatives.  After Mr. Mangrum was assigned to the Pilot on West Trinity Lane, Wackenhut received nothing but compliments on his job performance.

Among other areas of inquiry, counsel questioned Mr. Bedlack about Mr. Mangrum's use of handcuffs while assigned to Pilot. Mr. Bedlack first learned about

---

[2] As described in the training materials, a "law enforcement wanna-be" security guard can be overzealous and may "overstep[] his or her legal authority," while a "hotdog" security guard "tries to handle every situation totally alone."

4

Mr. Mangrum's handcuff usage as part of the litigation resulting from the shooting. Before the shooting, he had never seen any reports of handcuff usage by Mr. Mangrum. Mr. Bedlack explained that, had he known, he would have investigated to determine whether Mr. Mangrum's use of handcuffs was appropriate under the circumstances.

Although Wackenhut required its personnel to complete a variety of written reports, some reports for the West Trinity Lane Pilot were missing. Despite the fact that several witnesses testified that area supervisors regularly visited the Pilot on West Trinity Lane, Mr. Bedlack conceded that Wackenhut was unable to produce any documentation of the supervisor visits.

At the conclusion of the plaintiff's proof, Wackenhut moved for a directed verdict on all claims for economic damages, negligence, punitive damages, and negligent hiring, training, and supervision. The court granted a directed verdict on all claims for funeral and medical expenses, punitive damages, and negligent hiring and training. Then the defense presented its evidence.

2. Defendant's Proof

Mr. Mangrum applied for a job with Wackenhut as an armed security guard following his discharge from the army. He completed his training, including firearms training, in early 2006. When he was first assigned to Pilot, Jim Goetz, the night manager, explained Mr. Mangrum's duties and also accompanied him on patrol. Illegal activities, such as prostitution, drugs, and panhandling, were common at this Pilot location. But before June 24, Mr. Mangrum had never been forced to use his baton or to draw his weapon, although he had used his handcuffs approximately 25-50 times. Mr. Mangrum maintained that he documented his use of handcuffs and left the completed reports in a binder at Pilot.

Pilot reserved its back lot for tractor-trailers. For safety reasons, cars were not allowed in the area; truck drivers had trouble seeing the smaller vehicles. According to Mr. Goetz, there was an extensive amount of crime in the back lot. Mr. Goetz sent the guard on duty to check on unauthorized vehicles in the back lot every night. He expected the guard to investigate what the occupants were doing and then decide whether to let them finish or tell them to move along. Mr. Mangrum patrolled the premises and regularly notified any drivers in the back lot to move.

According to Mr. Goetz, the main duty of the armed guard was to keep employees and customers safe. During his time with Pilot, Mr. Goetz worked with approximately forty Wackenhut security guards. When a new guard was assigned to Pilot, he spent time observing the guard's interactions with customers and others. He had no criticisms of Mr. Mangrum's performance. And he could not recall any customer complaints about Mr. Mangrum. While he described Mr. Mangrum as cocky and aggressive, he meant the

5

description as a compliment. In his view, an assertive attitude was necessary to maintain safety in a dangerous location. And Mr. Mangrum knew when to ask for help.

Still, Mr. Goetz admitted that he had intervened between Mr. Mangrum and others on occasion. According to Mr. Goetz, the problem was always the customer, not Mr. Mangrum. Mr. Mangrum always conducted himself in a professional manner.

At around 2:25 a.m. on June 24, Mr. Mangrum was standing in the back of the Pilot store with Mr. Goetz. They noticed two cars enter the back lot, so Mr. Mangrum went to check on them. The first car was a trucker unloading clothes and food. He gave the trucker five minutes to complete his task and move the car.

He then approached the second vehicle. Mr. Mangrum testified that he first saw a man standing on the passenger side leaning over the car. The passenger door was open. Because the area was loud, he approached more closely than usual so that he could easily be heard. As he approached, he noticed someone else was inside the car. The man abruptly shut the car door and grabbed him around the neck. Mr. Mangrum smelled alcohol. The two men struggled against the back of the car. Mr. Mangrum broke free. He then pushed the man to the ground, intending to arrest him for assault. He tried to call for help on his radio. But there was no response. Before he could apply the handcuffs, the man rose to his feet, knocking Mr. Mangrum back against the car. Mr. Mangrum pulled out his baton and tried to talk to the man.

At this point, a woman emerged from the car. He asked her if she was okay and tried to enlist her help. And hoping to deescalate the situation, he threw his baton aside. He also quickly tried to contact a local police officer that he had on speed dial. But the officer did not answer the call. Believing that the man had turned his aggression toward the woman, he again tried to handcuff the man. But then the man hit him, and Mr. Mangrum fell back into a tractor-trailer. The next thing he knew, the man was on top of him, hitting his head and face. He could not reach his pepper spray. He felt a tug on his belt and believed the man was reaching for his gun. Out of fear for his life, he pulled his gun and fired.

According to Mr. Mangrum, the situation escalated so quickly that he had no time to call 911. He never felt that it was possible to just walk away. He admitted he was closer to Mr. Alumbaugh than he should have been; he voluntarily reengaged with Mr. Alumbaugh because he believed the woman was in danger. Mr. Mangrum claimed he could not recall the specifics of any conversation he had with Mr. Alumbaugh or Ms. McDunn that night. But he denied using profanity or threatening to shoot Mr. Alumbaugh.

Detective Hugh Coleman, an expert in homicide investigations and use of force, opined that Mr. Mangrum shot Mr. Alumbaugh in self-defense. He used the police file,

6

including witness statements, to form his opinion. And during his testimony, he mentioned a Mr. and Mrs. Johnson had provided statements to the police. He also disclosed that Mrs. Johnson had called 911 at 2:35 a.m. from inside a nearby tractor-trailer.

After the defense concluded its proof, the plaintiff sought to show the jury excerpts from the videotaped depositions of Mr. and Mrs. Johnson as rebuttal evidence. According to the plaintiff, Mr. and Mrs. Johnson were eyewitnesses to the confrontation, and their version of events was "diametrically opposed" to Mr. Mangrum's testimony. The plaintiff claimed that the Johnsons would describe an intentional execution, not a fight with a tragic end. After reviewing the proffered testimony, the court denied the plaintiff's request as an inappropriate use of rebuttal evidence.

Wackenhut then renewed its previous motion for a directed verdict. The court granted a directed verdict on negligent supervision but concluded that negligence and self-defense were jury issues. The jury found that Mr. Mangrum did not act in self-defense and apportioned fault 63% to the decedent and 37% to Wackenhut. The court approved the jury verdict and entered judgment in favor of Wackenhut. After the court denied the plaintiff's motion for a new trial, this appeal followed.

## II.

The plaintiff argues that the trial court committed reversible error in: (1) denying her request to present the Johnsons' videotaped depositions in rebuttal; (2) directing verdicts on negligent supervision and punitive damages; (3) denying her motion to amend the pleadings to conform to the evidence; and (4) denying her request for a special jury instruction. She also contends that the cumulative effect of the trial court's errors deprived her of a fair trial.

### A. REBUTTAL EVIDENCE

The trial court has broad authority to control the conduct of a trial. Tenn. R. Evid. 611(a). We review a trial court's decision to admit or deny rebuttal evidence under an abuse of discretion standard. *Godbee v. Dimick*, 213 S.W.3d 865, 877 (Tenn. Ct. App. 2006). An abuse of discretion occurs when a court "causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

Rebuttal evidence explains or contradicts evidence presented for the first time during the defendant's case. *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn. 1979); *Godbee*, 213 S.W.3d at 877. The fact that the plaintiff could have offered the same

7

evidence as part of her case-in-chief does not preclude the evidence from being offered in rebuttal. *Coates v. Thompson*, 666 S.W.2d 69, 76 (Tenn. Ct. App. 1983). During the case-in-chief, the plaintiff is only required to present evidence on the issues for which she bears the burden of proof. *Id.*

The plaintiff argues that the Johnsons' testimony was classic rebuttal evidence. According to the plaintiff, her case-in-chief focused on negligence and negligent supervision. Wackenhut had the burden of proving self-defense. And she was entitled to counter Wackenhut's proof of self-defense with rebuttal evidence. *See Godbee*, 213 S.W.3d at 877-78.

But this is not the classic case. *Cf. State v. Sinclair*, No. 02C01-9503-CC-00066, 1996 WL 181432, at *6 (Tenn. Crim. App. Apr. 17, 1996) (concluding that the trial court did not abuse its discretion in allowing the State to present evidence to rebut the defendant's self-defense claim when "self-defense was not actually raised until the Defendant testified"). As the trial court pointed out, the plaintiff presented evidence in her case-in-chief from which the jury could find that Mr. Alumbaugh was the aggressor in the confrontation with Mr. Mangrum. The defense evidence generally corroborated Ms. McDunn's testimony. *See Godbee*, 213 S.W.3d at 880 ("[T]he determinative question is . . . what the jury knew from the in-court evidence presented to them."). This is not a case in which self-defense was first raised during the defendant's proof. A trial court may refuse to allow plaintiffs to present evidence in rebuttal that contradicts their own proof. *See E. Tenn. Grading, Inc. v. Bank of Am., N.A.*, 338 S.W.3d 506, 516 (Tenn. Ct. App. 2010) (concluding that rebuttal evidence offered by the plaintiff that contradicted testimony during plaintiff's case-in-chief was properly excluded); *Watts v. Wilkerson*, No. 03A01-9310-CV-00350, 1994 WL 85951, at *2 (Tenn. Ct. App. Mar. 9, 1994) (concluding the trial court did not abuse its discretion in excluding evidence offered in rebuttal that contradicted the plaintiff's case-in-chief).

Additionally, in our view, the Johnsons' testimony was necessary for the plaintiff to establish her claim for punitive damages. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). The Johnsons provided the only evidence of "truly reprehensible conduct" sufficient to justify such an award. *Id.* (quoting *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me. 1985)). If anywhere, the Johnsons' testimony belonged in the plaintiff's case-in-chief, not in rebuttal.

Alternatively, the plaintiff contends that the Johnsons' testimony was admissible for impeachment purposes. A plaintiff may present rebuttal evidence to impeach a defense witness through the use of a prior inconsistent statement. *State v. Braden*, 867 S.W.2d 750, 760 (Tenn. Crim. App. 1993); *see* Tenn. R. Evid. 613(b). Mr. Mangrum denied making the statements that the Johnsons have attributed to him. But if truly offered for impeachment, only those portions of the Johnsons' testimony that "showed inconsistencies in the witness' trial testimony" should have been offered. *State v.*

8

*DePriest*, 697 S.W.2d 597, 601 (Tenn. Crim. App. 1985). Here, the plaintiff opposed limiting the Johnsons' testimony to just those statements.

The trial court was not convinced that the plaintiff's true purpose in offering the Johnsons' testimony was impeachment. In the court's view, the only reason the plaintiff saved this evidence for rebuttal was to obtain a tactical advantage: "to make sure that the last thing the jury hear[d] [wa]s testimony of these witnesses." The plaintiff's counsel acknowledged that he had taken a calculated risk in saving this eyewitness testimony for rebuttal. The Johnsons were the plaintiff's strongest witnesses; they presented a dramatically different version of events that contradicted even the plaintiff's case-in-chief.

Under these circumstances, the trial court did not abuse its discretion in excluding the Johnsons' testimony as improper rebuttal.[3] *Cf. State v. West*, 825 S.W.2d 695, 698 (Tenn. Crim. App. 1992) (disapproving of the State's decision to save its strongest witness for rebuttal); *Hoem v. Zia*, 606 N.E.2d 818, 831 (Ill. App. Ct. 1992) (concluding that proffered evidence was proper rebuttal and noting that "the present case is not one in which the plaintiff has purposely elected to save his best witness for rebuttal"). Rebuttal is not a vehicle for "[a] change in litigation strategy" or to correct "any oversights in the . . . case-in-chief." *George Washington Univ. v. Lawson*, 745 A.2d 323, 327 (D.C. 2000) (alteration in original).

## B. DIRECTED VERDICT

### 1. Punitive Damages

The trial court granted a directed verdict on punitive damages at the close of the plaintiff's proof. In reviewing the trial court's decision, we must "take the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor and disregarding all countervailing evidence." *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006). Because this is a punitive damages claim, the evidence of the defendant's conduct must be clear and convincing. *Sanford v. Waugh & Co.*, 328 S.W.3d 836, 848 (Tenn. 2010); *Hughes v. Lumbermens Mut. Cas. Co.*, 2 S.W.3d 218, 227 (Tenn. Ct. App. 1999). "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges*, 833 S.W.2d at 901 n.3. It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

---

[3] The plaintiff also asserts that the Johnson testimony was admissible to challenge the basis for Detective Coleman's expert opinions. But the mere fact that the expert used the Johnsons' witness statements in forming his opinions does not make their testimony admissible as rebuttal. *See* Tenn. R. Evid. 703 (allowing experts to rely on inadmissible evidence). And the plaintiff had ample opportunity to cross-examine Detective Coleman.

Punitive damages may be awarded if the defendant "acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges*, 833 S.W.2d at 901. The plaintiff concedes that we are only concerned with whether she presented clear and convincing evidence of recklessness. "A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Id.* According to the plaintiff, ordinary negligence may be considered gross negligence or recklessness when a gun is involved. *See Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 938 (Tenn. 1994) ("An act which otherwise would be simple negligence, may amount to gross negligence if it involves a dangerous or lethal instrumentality." (citing *Phelps v. Magnavox Co.*, 497 S.W.2d 898, 906 (Tenn. Ct. App. 1972))).

We are not persuaded by the plaintiff's argument. She conflates two separate concepts—the degree of care necessary when using a dangerous instrumentality and the level of culpability required to justify an award of punitive damages. In all negligence cases, "[t]he greater the danger, the greater the care which must be exercised." RESTATEMENT (SECOND) OF TORTS § 298 cmt. b (AM. LAW INST. 1965); *see West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005) (explaining that the definition of reasonable care will vary depending on the "probable dangers attending the particular situation" and the risk of injury).

> [I]f the act involves a risk of death or serious bodily harm, and particularly if it is capable of causing such results to a number of persons, the highest attention and caution are required even if the act has a very considerable utility. Thus those who deal with firearms, explosives, poisonous drugs, or high tension electricity are required to exercise the closest attention and the most careful precautions, not only in preparing for their use but in using them.

RESTATEMENT (SECOND) OF TORTS § 298 cmt. b (AM. LAW INST. 1965). But this heightened duty of care is not a springboard to punitive damages.

Punitive damages are reserved for "cases involving only the most egregious of wrongs." *Hodges*, 833 S.W.2d at 901. Taking the strongest legitimate view of the evidence presented in the plaintiff's case-in-chief, we conclude that no reasonable juror could find that the conduct of Mr. Mangrum or Wackenhut was reckless. Wackenhut developed an in-depth screening process and a comprehensive training program for its employees. Mr. Mangrum successfully completed that process. After Mr. Mangrum was posted at Pilot, Wackenhut never received any negative reports from the client or others. Proof that Wackenhut failed to adequately document its supervision of Mr. Mangrum and that it was unaware of Mr. Mangrum's prior use of handcuffs was simply insufficient to establish a conscious disregard on the part of Wackenhut of a substantial and

10

unjustifiable risk. And the testimony of Ms. McDunn concerning Mr. Mangrum's actions failed to demonstrate any "truly reprehensible conduct." *See id.* (quoting *Tuttle*, 494 A.2d at 1361).

2. Negligent Supervision

The plaintiff also asserts the trial court erred in granting a directed verdict on negligent supervision at the close of all the proof. A directed verdict is appropriate if the record lacks material evidence on one or more elements necessary to prove negligent supervision. *See Richardson v. Miller*, 44 S.W.3d 1, 30 (Tenn. Ct. App. 2000). In reviewing the trial court's decision, we must again take the strongest legitimate view of the evidence in favor of the plaintiff, including all reasonable inferences, and disregard all countervailing evidence. *Id.*

Evidence that the employer had notice of the employee's propensity to commit misconduct is an essential element of a negligent supervision claim. *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 454 (Tenn. 2012); *see also Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008) ("A plaintiff in Tennessee may recover for negligent . . . supervision . . . if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job."). But not all evidence of misconduct will suffice. The prior misconduct must have some connection or relevance to the conduct that caused the injury. *See Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 703 (Tenn. Ct. App. 2012) (explaining that the facts alleged to support the claim of negligent supervision were "irrelevant in the context of this case"); 1 STUART M. SPEISER ET AL., AMERICAN LAW OF TORTS § 4:11, Westlaw (database updated Mar. 2018) (explaining that a prima facie case of negligent supervision requires some evidence of the employee's tendencies to engage in behavior relevant to the injuries suffered). Foreseeability is the key. *See Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992). There must be evidence from which the "tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991); *see also Smith v. Keyport Self-Storage*, No. W1998-00810-COA-R3-CV, 2000 WL 558604, at *4 (Tenn. Ct. App. May 5, 2000) (determining that the evidence of previous misconduct was insufficient to establish that the employee's conduct was foreseeable).

We conclude that the plaintiff failed to demonstrate that Wackenhut had knowledge of Mr. Mangrum's propensity to engage in the conduct that caused the injury.[4] At best, this record contains evidence from which a reasonable juror could

---

[4] We are not persuaded by the plaintiff's contention that the jury could infer negligent supervision from Wackenhut's lack of documentation. As our supreme court has explained, negligent supervision requires proof that the employer had sufficient knowledge of the employee's conduct to compel the

conclude that Mr. Mangrum handcuffed 25-50 individuals while posted at Pilot and Wackenhut should have known of this conduct. Handcuffing by itself was not a per se violation of Wackenhut policy. And there is no evidence that the handcuffing incidents were wrongful or associated with physical violence. Knowledge of Mr. Mangrum's frequent use of handcuffs did not put Wackenhut on notice that a violent physical altercation was a reasonably foreseeable probability. *See Doe v. Linder Constr. Co.*, 845 S.W.2d at 178 (explaining that "the plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility" (quoting *Tedder v. Raskin*, 728 S.W.2d 343, 348 (Tenn. Ct. App. 1987))).

### C. AMENDMENT OF THE PLEADINGS TO CONFORM TO THE EVIDENCE

The plaintiff also challenges the court's denial of her motion to amend her complaint at the close of the proof to include a claim for false imprisonment. The trial court's decision will be upheld absent an abuse of discretion. *See Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 892 (Tenn. 1980).

"When issues not raised by the pleadings are tried by express or implied consent of the parties," the court should allow a party to amend the pleadings to conform to the evidence. Tenn. R. Civ. P. 15.02. Wackenhut did not expressly consent to try a false imprisonment claim. So we consider whether Wackenhut's consent might be implied.

Courts will find implied consent when the opposing party "knew or should reasonably have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby." *Zack Cheek Builders, Inc.*, 597 S.W.2d at 890. When evidence relevant to an unpled issue is introduced without objection or the evidence was introduced by the party opposed to the motion to amend, courts will find implied consent. *Id.* But if the evidence on an unpled issue is also relevant to an issue raised by the pleadings, trial by implied consent has not been shown. *Christmas Lumber Co. v. Valiga*, 99 S.W.3d 585, 593 (Tenn. Ct. App. 2002).

Denial of the plaintiff's motion to amend was not an abuse of discretion. From the outset, this trial concerned whether Mr. Mangrum exercised reasonable care in dealing with Mr. Alumbaugh. The proof focused on how Mr. Mangrum approached Mr. Alumbaugh and his actions during the confrontation. Any evidence that would tend to support a false imprisonment claim was equally relevant to the negligence claim. *See id.* at 593-94. Thus we conclude that the plaintiff could not demonstrate implied consent.

---

employer to exercise its duty to control the employee. *See Redwing*, 363 S.W.3d at 453-54. Such proof was lacking here.

## D.  MISSING EVIDENCE INSTRUCTION

Finally, we address the plaintiff's request for a special jury instruction on missing evidence.  The trial court had a duty to instruct the jury regarding every factual issue and theory for recovery that was raised by the pleadings and supported by the evidence. *Johnson*, 205 S.W.3d at 372.  The court should include a requested jury instruction in the jury charge if the instruction "is a correct statement of the law, is not included in the general charge, and is supported by the evidence introduced at trial." *Spellmeyer v. Tenn. Farmers Mut. Ins. Co.*, 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993).  We will not reverse the judgment unless "the improper denial of a request for a special jury instruction has prejudiced the rights of the requesting party." *Johnson*, 205 S.W.3d at 372.  The plaintiff must affirmatively show that the refusal to grant the requested instruction affected the result of the trial. *Id.*

The plaintiff's proposed jury instruction focused solely on Wackenhut's failure to produce the incident reports Mr. Mangrum claimed to have completed each time he used his handcuffs while on duty at Pilot.[5]  Under the missing evidence rule, the trier of fact may infer that missing evidence would have been unfavorable to the party that failed to offer it into evidence if the evidence was in that party's exclusive possession and the evidence "would be 'capable of shedding light on a material contested issue.'" *Tatham v. Bridgestone Americas Holding, Inc.*, 473 S.W.3d 734, 740 n.3 (Tenn. 2015) (quoting *Richardson*, 44 S.W.3d at 27-28).  A defining characteristic of "missing evidence" is that the party possessing the evidence could have used the evidence at trial but for some reason chose not to do so. *Id.*  When evidence has been destroyed, the doctrine of spoliation may apply, but not the missing evidence rule.[6] *Id.*

---

[5] The plaintiff requested that the court instruct the jury as follows:

> The Court instructs you that Wackenhut was required by Court Order to produce any incident reports prepared by security guards at Pilot prior to June 24, 2007.  Wackenhut claims that all incident reports for at least five months prior to the shooting of Timothy Alumbaugh were lost or destroyed and could not be produced.  Accordingly, the Court instructs you that you may infer that the evidence that Wackenhut failed to produce would have been unfavorable to it.  You are not, however, required to determine in what respect it would have been unfavorable not to give this adverse inference any particular weight in comparison with other facts and circumstances.  The inference to be drawn from the conduct of Wackenhut may well be a persuasive factor in the process of weighing and interpreting the testimony offered by Wackenhut.

[6] When evidence has been destroyed, the trial court has the discretion to impose sanctions on the spoliating party, including the use of a negative inference, "based upon a consideration of the totality of the circumstances." *Tatham*, 473 S.W.3d at 746.  In making this determination, the trial court should consider such factors as:

> (1) the culpability of the spoliating party in causing the destruction of the evidence, including evidence of intentional misconduct or fraudulent intent;

We conclude that the plaintiff's proposed instruction was not warranted under these facts. Mr. Mangrum testified that he completed the incident reports and left them in a binder at Pilot. But Mr. Bedlack never saw the reports. The plaintiff requested the reports during discovery, but Wackenhut was never able to find them. Mr. Bedlack denied that Wackenhut purposefully or intentionally destroyed any evidence. He assumed that some documents must have been accidentally shredded during the relocation of Wackenhut's Nashville office. It is unclear whether Wackenhut ever had possession of these reports. *See In re Estate of Link*, 542 S.W.3d 438, 462 (Tenn. Ct. App. 2017) (noting that most of the "missing documents" were irrelevant to the issues in the case and the plaintiff had not shown that the documents were in the defendant's exclusive control during the pendency of the case). And, more importantly, the plaintiff failed to demonstrate that these reports constituted evidence that a reasonable person under these circumstances would have offered into evidence at trial if they had been favorable. *See Richardson*, 44 S.W.3d at 28. The reports were not "capable of shedding light on a material contested issue." *See id.* at 27-28. As discussed above, even if Wackenhut had knowledge of the reports, this knowledge was insufficient to state a claim for negligent supervision.

## III.

For the foregoing reasons, we conclude that the trial court did not commit reversible error and the plaintiff received a fair trial. Thus we affirm the trial court in all respects.

---

                                    _____

                                    W. NEAL McBRAYER, JUDGE

---

(2) the degree of prejudice suffered by the non-spoliating party as a result of the absence of the evidence;

(3) whether, at the time the evidence was destroyed, the spoliating party knew or should have known that the evidence was relevant to pending or reasonably foreseeable litigation; and

(4) the least severe sanction available to remedy any prejudice caused to the non-spoliating party.

*Id.* at 746-47.

14